IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

WILLIAM F. KAWA, )
 )
    Plaintiff, )
 )
 )
v. ) 1:12CV184
 )
DUKE UNIVERSITY HEALTH )
SERVICES, )
 )
    Defendant. )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This matter is before the court on Defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Docket Entry 16.) Plaintiff William F. Kawa opposes the motion. (Docket Entry 19.) For the following reasons, it will be recommended that the Court grant Defendant's motion for summary judgment.

## I. PROCEDURAL BACKGROUND

On November 21, 2011, Plaintiff filed this action against Defendant, Duke University Health Systems ("Duke"), in Orange County Superior Court. The action was removed to this court on February 23, 2012. (Docket Entry 1). Plaintiff alleges violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended ("Title VII"). (Docket Entry 5.) On November 29, 2012, Defendant Duke filed the instant motion for summary judgment.[1]

---

[1] Plaintiff originally asserted three separate claims, for religious discrimination, race discrimination and retaliatory discharge. In his memorandum in opposition to Defendant's motion for summary judgment, however, Plaintiff acknowledges that "the court should grant defendant's motion for

## II. FACTUAL BACKGROUND

On a motion for summary judgment, this court views the evidence in the light most favorable to Plaintiff, the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).

In December 2010, Plaintiff was hired by Stephanie Kerr, a nurse manager for Duke's Cardiac Diagnostic Unit ("CDU"), as a CDU patient transporter. (Def.'s Mot. for Summ. J., Ex. 3, Decl. of Stephanie Kerr ¶1, Docket Entry 16-3.) CDU transporters were responsible for taking patients undergoing cardiac testing to and from the clinical areas. (*Id.*) Plaintiff had previously worked for Duke in a part-time temporary position as a patient transporter for Duke's Patient Visitor Services Department, performing similar duties. (Kerr Decl. ¶ 3.) Plaintiff worked with two other transporters, Matthew Swan, who had begun working for Duke a few months before Plaintiff was hired, and Kirby Burns, who had worked at Duke since 1990. (Kerr Decl. ¶ 2.)

All new regular staff hires at Duke are subject to a ninety-day probationary period. This probationary period may be extended by thirty days if additional time is needed to determine the employee's "ability to succeed in the position." (Kerr Decl. ¶ 3.) Plaintiff was informed of Duke's probationary period policy in the letter he received from Kerr offering him the job. (Def.'s Mot. for Summ. J., Dep. of William Kawa, Ex. 1, Docket Entry 16-2.) Plaintiff indicated his acceptance of the employment offer and terms as explained in the

---

summary judgment with respect to the race discrimination and retaliatory discharge claims." (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. at 1, Docket Entry 19.) Thus, only the religious discrimination claim remains for the court's consideration.

letter by signing the original and returning it to Kerr. (Kawa Dep. Ex. 2, Docket Entry 16-2.) Furthermore, as outlined in Duke's employment policies, "if the new staff member and his or her supervisor are not fully confident of the suitability of the recent placement and/or performance during the orientation and evaluation period, either party may terminate the employment relationship without prior notice." (Kawa Dep. Ex. 6, Docket Entry 16-2.)

On January 21, 2011, less than halfway through Plaintiff's probationary period, a patient's family submitted a complaint through Duke's Safety Reporting System ("SRS") with regard to an incident involving Plaintiff. (Kerr Decl. ¶ 4.) The gist of the complaint was that Plaintiff and another staff member "exchanged words" over multiple orders for a patient and which order took precedence. Plaintiff contends that the other staff member, Dierdre Reels, "disrupted the situation" in front of the patient and the family. (Kawa Dep. at 48, Docket Entry 16-1.) A report was written up by a nurse who was in the room who noted "[p]oor communication from [Plaintiff] to the patient and family members." (Kerr Decl. ¶ 4.) The patient's family later requested that Plaintiff not transport their family member. No complaint was made as to the behavior of the other employee involved in the incident. (*Id.*)

On February 4, 2011, Kerr conducted Plaintiff's mid-probation period review. (Kerr Decl. ¶ 5.) During this meeting, Plaintiff expressed concern about his lack of communication with his fellow transporter, Kirby Burns, saying he felt alienated from Burns. (Kawa Dep. at 53.) Plaintiff alleges that prior to this mid-review, he had notified Kerr of an incident where Burns did not stay past his scheduled shift end to assist Plaintiff as he had been requested to do. The following day, Plaintiff alleges that Burns greeted him with the

3

phrase "Kill Bill," which Plaintiff did not appreciate and Plaintiff requested Burns to not refer to him as Kill Bill "because I could take this literally." (Kawa Dep., Ex. 12, Docket Entry 16-2.)

At the time of the mid-review, Plaintiff expressed no concerns about the third member of the transport team, Matt Swan. (Kawa Dep. 53.) Plaintiff did testify, however, that several months into his employment Kerr informed Plaintiff that Swan, who spoke with a stutter, had complained about Plaintiff because he had made comments about Swan's speech. (*Id.* at 59-60.)

On March 7, 2011, Plaintiff and Burns met with Kerr and her assistant, Linda Benedict. (Kawa Dep. at 61-62; Kerr Decl. ¶ 7.) Kerr called the "impromptu" meeting to discuss Burns' complaints about Plaintiff not carrying his share of the workload. (Kerr Decl. ¶ 7.) Burns stated that Plaintiff was not pulling his weight and that Plaintiff had spit in his coffee. According to Burns, Swan had witnessed this spitting incident, and Swan later confirmed the event to Kerr. Burns and Plaintiff continued to "debate" the workload issue, and according to Kerr, Burns stated "[i]f you don't take care of this, I will, even if I have to go to jail." (*Id.*) Plaintiff informed Kerr that he viewed this remark to be threatening, and that he intended to seek assistance from Duke's Personal Assistance Service, a counseling service for Duke employees. (*Id.*) Kerr told Plaintiff to take the next day off with pay and provided him information for the website of Duke's Office of Institutional Equity, where he could "read up on the harassment policy." (*Id.*; *see also* Kawa Dep., Ex. 14, Docket Entry 16-2.) Kerr placed Burns on administrative leave; he ultimately received a one-week suspension and a Final Written Warning for the outburst. (Kerr Decl. ¶ 7.)

4

Case 1:12-cv-00184-WO-JLW   Document 25   Filed 05/17/13   Page 4 of 16

On March 14, 2011, Kerr informed Plaintiff that his probationary period would be extended for an additional thirty days, pursuant to Duke policy. (Kawa Dep. at 84; Kerr Decl. ¶ 9.) Kerr told Plaintiff that her investigation had revealed that he had engaged in antagonistic behaviors and that "he needed to demonstrate improvement in the area of teamwork including his documented communication issues, minimizing complaining and negative comments, and avoiding inappropriate gestures." (Kerr Decl. ¶ 9.) Additionally, Kerr informed Plaintiff that Burns had been disciplined and would be returning to work, and that Plaintiff should notify Kerr of any issues with Burns' behavior. (*Id.*) Kerr also informed Plaintiff that beginning on April 11, 2011, the department would be implementing a trial plan to reassign and place the CDU transporters under the supervision of Patient Visitor Services, the same department where Plaintiff had worked as a temporary employee prior to being hired in the CDU. (*Id.*)

Over the next weeks, Kerr saw no improvement in Plaintiff's communication and teamwork, areas which she had previously discussed with him. (Kerr Decl. ¶ 10.) Additionally, Kerr spoke with two supervisors in the Patient Visitor Services Department, where Plaintiff had previously worked, and where the CDU transporters would be assigned as of April 11, 2011. The two supervisors in that department both indicated to Kerr that they did not want Plaintiff to return to their department, as they had had issues with communication and teamwork with Plaintiff previously. *Id.*

Plaintiff alleged that on or around March 17, 2011, Kerr informed him that Burns and Swan had both complained that Plaintiff crossed his heart or chest to symbolize that he was praying. Kerr told Plaintiff to stop using the gestures because they were perceived as

5

antagonistic. (Kawa Dep. at 108; *see also* Kawa Dep., Ex. 22, EEOC Charge at 2, Docket Entry 16-2.) In his deposition, Plaintiff identified no other acts of religious discrimination against him, aside from being told to not make the sign of the cross. (Kawa Dep. 108.)

On March 31, 2011, Kerr informed Plaintiff that his employment was terminated due to his failure to successfully complete his probationary period. (Kerr Decl. ¶ 11; Kawa Dep. at 100-01.) In the Notice of Termination sent to Plaintiff, Kerr cited communication skills and teamwork as two areas where Plaintiff's performance was not acceptable. (Kawa Dep., Ex. 21, Docket Entry 16-2.)

On May 20, 2011, Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC"), alleging race discrimination, religious discrimination and retaliatory discharge. (*Id.* Ex. 22.) The EEOC dismissed the charge on October 28, 2011. (*Id.* Ex. 23.)

## III. DISCUSSION

A. Standard of Review

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Zahodnick v. Int'l Bus. Machs. Corp.*, 135 F.3d 911, 913 (4th Cir. 1997). The party seeking summary judgment bears the initial burden of coming forward and demonstrating the absence of a genuine issue of material fact. *Temkin v. Frederick County Comm'rs*, 945 F.2d 716, 718 (4th Cir. 1991) (citing *Celotex v. Catrett*, 477 U.S. 317, 323 (1986)). Once the moving party has met its burden, the non-moving party must then affirmatively demonstrate that there is a genuine issue of material fact which requires trial. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). There is no issue for trial unless there is

6

sufficient evidence favoring the non-moving party for a fact finder to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Sylvia Dev. Corp. v. Calvert County, Md.*, 48 F.3d 810, 817 (4th Cir. 1995). Thus, the moving party can bear his burden either by presenting affirmative evidence or by demonstrating that the non-moving party's evidence is insufficient to establish his claim. *Celotex*, 477 U.S. at 331 (Brennan, dissenting). When making the summary judgment determination, the court must view the evidence, and all justifiable inferences from the evidence, in the light most favorable to the non-moving party. *Zahodnick*, 135 F.3d at 913; *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 196 (4th Cir. 1997).

Moreover, "once the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial." *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874-75 (4th Cir. 1992). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *Id.* The non-movant's proof must meet the substantive evidentiary standard of proof that would apply at a trial on the merits. *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993), modified on other grounds, *Stokes v. Westinghouse Savannah River Co.*, 420, 429-30 (4th Cir. 2000); *DeLeon v. St. Joseph Hosp., Inc.*, 871 F.2d 1229, 1233 n.7 (4th Cir. 1989). Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment. *Evans v. Techs. Applicationss & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996).

In discrimination cases, a party is entitled to summary judgment if no reasonable jury could rule in the non-moving party's favor. *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290

7

F.3d 639, 645 (4th Cir. 2002). The court cannot make credibility determinations or weigh the evidence, but the court should examine uncontradicted and unimpeached evidence offered by the moving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The court must determine whether a party's offered evidence is legally sufficient to support a finding of discrimination and look at the strength of a party's case on its terms. As the *Reeves* court noted:

> Certainly there will be instances where, although the plaintiff has established a *prima facie* case and set forth sufficient evidence to reject the defendant's explanation, no rational fact-finder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

*Reeves*, 530 U.S. at 148. In *Dennis*, a case decided after *Reeves*, the Court of Appeals for the Fourth Circuit noted that the *Reeves* court "instructs more broadly that factors on which the appropriateness of a judgment as a matter of law will depend in any case will include 'the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Dennis*, 290 F.3d at 649 (quoting *Reeves*, 530 U.S. at 148-49).

B. <u>Analysis</u>

Plaintiff alleges that Duke discriminated against him based on his religion in violation of Title VII. Defendant argues that Plaintiff has failed to establish his *prima facie* case of

8

discrimination and that summary judgment is proper because there is no genuine issue of material fact.

Title VII makes it "an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensations, terms, conditions, or privileges of employment, because of such individual's race, color, religions, sex, or national origin . . . ." 42 U.S.C § 2000e-2(a)(1). A plaintiff may proceed under ordinary principles of proof using direct or indirect evidence, or in the absence of direct proof of a defendant's intent to discriminate, a plaintiff may employ the burden-shifting framework outlined in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973) to establish a *prima facie* case of discrimination.

If a plaintiff establishes a *prima facie* case, the burden shifts to the defendant employer to "articulate a legitimate, non-discriminatory reason for its actions towards the employee." *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1017-18 (4th Cir. 1996). If the defendant articulates such a reason, the burden then shifts back to the plaintiff to show that the defendant's proffered reason is merely pretextual and "that the employer's conduct towards [him] was actually motivated by illegal considerations." *Id.* at 1018. Even with the burden shifting, the ultimate burden of persuasion lies with the plaintiff. *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

Courts have recognized two theories underlying claims of religious discrimination: "disparate treatment" and "failure to accommodate." *See Chalmers*, 101 F.3d at 1017.

9

Plaintiff here is asserting a disparate treatment claim.[2] To establish a *prima facie* disparate treatment case based on religious discrimination, Plaintiff must (1) show that he was a member of a protected group; (2) show that he was performing his job satisfactorily; and (3) present direct or indirect evidence whose cumulative probative force supports a reasonable inference that his discharge was discriminatory. *Dachman v. Shalala*, 9 Fed. App'x 186, 189 (4th Cir. 2001); *Chalmers*, 101 F.3d at 1017.

Here, there is no direct evidence of discriminatory animus motivating Plaintiff's termination, nor has Plaintiff met his burden of proof with respect to establishing a *prima facie* case for religious discrimination under the disparate treatment theory. Plaintiff has simply not proven that his job performance was satisfactory, as required by the *prima facie* test under this theory. In contrast, Defendant has presented evidence of complaints by patients and co-workers of Plaintiff, and consistent communication and teamwork issues involving Plaintiff. To the extent that Plaintiff disputes some of the details of these incidents, the Court finds that the facts contested by Plaintiff are not material and Plaintiff has not created issues for trial.

---

[2] In his memorandum, Plaintiff asserts, for the first time, a failure to accommodate claim. (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. 9-11, Docket Entry 19.) This claim fails for several reasons. First, Plaintiff never raised this claim in his EEOC charge; in fact, in that charge there is no reference to any facts which would support a religious accommodation claim. (Kawa Dep., Ex. 22, Docket 16-2.) The scope of a plaintiff's right to file a federal lawsuit is determined by the contents of the EEOC charge. *Jones v. Calvert Group, Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009). Here, the failure of Plaintiff to include a failure to accommodate claim in the EEOC charge renders this court to be without subject matter jurisdiction. *See id.* ("[A] failure by the plaintiff to exhaust administrative remedies concerning a Title VII claim deprives the federal courts of subject matter jurisdiction over the claim."). Moreover, even on the merits, Plaintiff has simply neither alleged nor shown that he requested a religious accommodation. When a plaintiff fails to request a religious accommodation, thereby declining to give his employer an opportunity to alleviate the discriminatory conduct, he has not pled an accommodation claim upon which relief can be granted. *Chalmers*, 101 F.3d at 1019-20.

10

Plaintiff was deposed at length by defense counsel and after reviewing his deposition testimony, Plaintiff submitted a detailed errata sheet setting forth corrections and revisions to his responses. (Def.'s Reply, Ex. 1, Errata Sheet, Docket Entry 21-1.) In his deposition, Plaintiff admitted that he was permitted to engage in Christian witnessing and outreach by praying with patients and other employees (Kawa Dep. at 119), that he never heard any coworkers make any comments about his religion (*Id.* at 110-11), that he never complained about religious discrimination at Duke, other than in PAS counseling (*Id.* at 108), that he was unaware of the religious beliefs of his two fellow CDU transporters, Burns and Swan (*Id.* at 124), and that he was instructed by his supervisor to not make any gestures which might be viewed as antagonistic to other employees.[3] (*Id.* at 108, 111.) Subsequently, in his affidavit submitted in response to Defendant's motion for summary judgment, Plaintiff makes several assertions which appear to contradict his deposition testimony. (Aff. of William Kawa, Docket Entry 18.) Such inconsistencies are insufficient to create a material issue of genuine fact. *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999) (noting, and leaving the law as it found it, virtual unanimous holdings by lower courts that "a party cannot create a genuine issue of material fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity."). The application of this "sham affidavit" rule "must be carefully limited to situations involving flat contradictions of material fact." *Mandengue v. ADT Sec. Sys., Inc.*, Civil Action No. ELH-09-3103, 2012 WL 892621, at *18 (D. Md. Mar.

---

[3] Plaintiff identified these gestures as "crossing my heart" and "the peace sign." (Kawa Dep. at 111.)

11

14, 2012). As quoted by the court in *Mandengue*, "The inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit." *Id.*; *see also Rohrbough v. Wyeth Laboratories, Inc.*, 916 F.2d 970, 975 (4th Cir. 1990).

In his deposition, Plaintiff was specifically asked if he was told that he could not pray at work. His response was: "I was told to stop crossing my heart." (Kawa Dep. at 111.) Later, when asked how Kerr discriminated against him, Plaintiff responded: "by asking me not to cross my heart, perform my practices of a Christian in the workplace." (*Id.* at 112.) Additionally, in response to a question about how, other than being told not to cross his heart, Plaintiff was "discriminated against based on [his] religion," he stated: "That's it." (*Id.* at 108.) This court finds that the following affidavit statements made by Plaintiff are properly disregarded in this context, where they so clearly contradict Plaintiff's deposition testimony:

> ¶ 3: The problems I had . . . were . . . with Matthew Swan, who appeared to be irreligious and who took offense at my religious beliefs and practices.
>
> ¶ 9: I said to Stephanie Kerr that I liked to pray at work. She told me that I must not pray at work. She said that my prayers disturbed Mr. Swan and other co-workers. In fact, I did pray with patients upon request, and Mr. Swan observed this and voiced his opposition to this.

(Kawa Aff., Docket Entry 18.) Plaintiff cannot properly submit an affidavit to refute arguments made in Defendant's brief by contradicting his own prior sworn testimony.

Plaintiff has simply not established that he was meeting Duke's legitimate expectations at the time of his termination. Defendant has presented evidence of a

12

complaint arising out of an incident with another employee early in Plaintiff's probationary period (Def.'s Mem. in Supp. of Mot. for Summ. J., Kawa Dep., Ex. 9, Docket Entry 16-2), together with evidence of communication issues between Plaintiff and his co-worker Burns. (Kawa Dep. at 52; Kerr Decl. ¶ 5). Additionally, Plaintiff's probationary period was extended due to issues of lack of teamwork, inappropriate comments and gestures, and the need to minimize negativity and complaining (Def.s Mem, Ex. 17) and Plaintiff failed to show improvement (Kerr Decl. ¶ 10.) Finally, all three of the CDU transporters were being reassigned to Patient Transport Systems,[4] where Plaintiff had previously worked, and according to Kerr, the supervisors did not want Plaintiff to return to work in that department. (Kerr Decl. ¶ 10.)

Plaintiff's attempt to create factual disputes on these issues is unavailing. He alleges that the patient complaint should not be held against him because Deidre Reels, the EKG technician with whom he argued, filed the complaint and she "caused the entire problem." (Pl.'s Mem. at 3.) According to Kerr, the report was filed by the nurse who was in the room, not the EKG technician. (*See* Kerr Decl. ¶ 4) and the incident report itself does not indicate who filed it. (Kawa Dep., Ex. 9, Docket Entry 16-2.) Plaintiff acknowledged in his deposition that Kerr told him that the complaint was submitted by "an anonymous nurse." (Def.'s Reply, Attach. A, Supp. Dep. Excerpts, Kawa Dep. at 49.) Regardless, Plaintiff has alleged no religious animus by Reels, the EKG technician. Moreover, it is undisputed that Kerr received the complaint regarding Plaintiff's conduct with the patient's family and that it

---

[4] Plaintiff's statement in his memorandum that the reassignment was the result of Kerr's decision to separate Plaintiff from Swan is simply not supported in the record. (*See* Kawa Dep., Ex. 20, Docket Entry 16-2.)

13

was a legitimate consideration in assessing Plaintiff's performance during the probationary period. *See Holland v. Washington Homes, Inc.*, 487 F.3d 208, 217 (4th Cir. 2008) (plaintiff must show that the decision maker did not honestly believe the circumstances underlying her decision); *Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 960-61 (4th Cir. 1996) ("It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.").

Plaintiff also asserts that he received a good performance evaluation on February 4, 2011, the mid-point of his initial probationary period, and that the Court should look to this evidence in determining whether Plaintiff was meeting Duke's legitimate expectations. Even disregarding the fact that Plaintiff's sole evidence of this "good" evaluation is contained in his affidavit, the caselaw is clear that Plaintiff's evidence must show that he was meeting his employer's legitimate expectations *at the time of his termination*. *See Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 518 (4th Cir. 2006) (opinions offered by the plaintiff lacked probative value as to whether he was meeting his employer's legitimate expectations at the time he was fired); *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 511-12 (4th Cir. 1994) (employer's comment that "there comes a time when we have to make way for younger people" lacked sufficient nexus to termination of employee when made two years prior that termination and was not directly connected to it). Plaintiff points to no evidence that he was meeting his employer's legitimate expectations on March 31, 2011, the day he was terminated.

Plaintiff also has not put forward sufficient evidence to create a reasonable inference that he was fired as a result of discriminatory animus with regard to his religion. In his deposition, Plaintiff admitted that he never heard anyone make comments about his religion (Kawa Dep. at 119) and that he had no knowledge about the religious beliefs of either Burns

or Swan, the two co-workers who he alleges discriminated against him because of his religious beliefs. (*Id.* at 124.) Contrary to the assertions made by Plaintiff in his memorandum, Kerr did not state in her declaration that she told Plaintiff that his prayers disturbed Swan and other employees. In her declaration, Kerr refers only to gestures made by Plaintiff, not to him praying. (Kerr Decl. ¶ 8.) Plaintiff has simply pointed to no evidence that his Christian religion was the reason Kerr terminated his employment.[5]

Furthermore, even if the court were to find that Plaintiff has established a *prima facie* case of religious discrimination, the evidence does not support a finding of pretext. In his response memorandum, Plaintiff speculates that Kerr's "positive attitude about [P]laintiff changed radically when she received complaints from [P]laintiff's co-worker Matthew Swan about his Christian prayers and sign of the Cross." (Pl.'s Mem. at 8, Docket Entry 19.) Plaintiff goes on to suggest that the "teamwork" and "communication" issues cited by Kerr were essentially pretext for the religious animosity against him. Plaintiff's unsubstantiated speculation is insufficient to overcome summary judgment.

---

[5] Plaintiff recently submitted the affidavit of Dustin Fontin, a co-worker of Plaintiff's at Duke. (Docket Entry 22-1.) This affidavit does not create a genuine issue of material fact. The affidavit is speculative at best and contains unsubstantiated assumptions regarding Matthew Swan's attitude toward Plaintiff and the alleged religious indifference of Kirby Burns. Even if the information in the affidavit about Burns and Swan were true, it does not change the fact that there was no evidence of discriminatory animus on the part of the decision maker, Kerr.

15

## IV. CONCLUSION

For the reasons stated herein, **IT IS RECOMMENDED** that Defendant's motion for summary judgment (Docket Entry 16) be **GRANTED**.

Joe L. Webster
United States Magistrate Judge

Durham, North Carolina
May 17, 2013